Seema Gordon *v.* Zoning Board of the City of Stamford et al.

George W. Baker et al. *v.* Hugh D. Catty et al.

Daly, C. J., Baldwin, King, Murphy and Mellitz, Js.

Argued October 7—decided October 28, 1958

*Julius B. Kuriansky,* for the appellant (plaintiff) in the first case.

*Herbert L. Cohen,* with whom were *E. Gaynor Brennan* and, on the brief, *E. Gaynor Brennan, Jr.,* for the appellants (plaintiffs) in the second case.

*Maurice J. Buckley,* with whom were *Arthur L. DiSesa* and, on the brief, *Richard B. Tweedy,* for the appellees (defendants) in each case.

MURPHY, J.   The plaintiffs in these two appeals are the owners of real property in a residential area

of Stamford. Their properties are adjacent to, or within the neighborhood of, thirty-nine acres of land which the zoning board on April 29, 1957, changed from an RA-1 one-family residence district to a C-D designed commercial district. They appealed to the Court of Common Pleas. From the judgments dismissing their appeals, they have appealed to this court.

The defendants Catty and Lilienthal are the owners of substantial acreage abutting the southerly side of the Merritt Parkway and lying between Turn of River Road, hereinafter referred to as River Road, and Newfield Avenue. Since the adoption of the present zoning regulations in Stamford in 1951, an area of several hundred acres in the Turn of River and Newfield sections has been zoned in the second highest residential zonal classification, RA-1, which primarily restricts its use to single-family residences on one-acre plots. Stamford Zoning Regs., §§ 4, 5, 6 (1956). The zoning map indicates that at least one-half, if not more, of the total area of the city is zoned RA-1. Except for that portion of the Catty property which borders the Merritt Parkway on the north and the east-bound entrance lane to it, for a distance of eighty-eight feet, on the west, the entire tract for which the change of zone was sought is surrounded by RA-1 property.

On February 4, 1957, Catty and the American Machine and Foundry Company, hereinafter referred to as A.M.F., applied to the defendant zoning board for a change of zone to C-D commercial to permit the use of the thirty-nine acres of the Catty and Lilienthal properties for the construction and maintenance of experimental and research laboratories by A.M.F. On that date, the zoning regulations provided for three types of designed districts,

R-D residence, C-D commercial and M-D industrial. Id., §§ 4, 8. The zoning map shows three isolated designed commercial districts, but it does not appear when they were created. The minimum plot areas for, and the uses permitted in, C-D and M-D districts were then the same. Id., § 8(B). On February 20, 1957, the board amended the designed district regulations by creating another district called B-D designed business district and designating the uses permitted therein. The uses permitted in C-D and M-D districts were changed entirely, and conditions and standards applicable to B-D, C-D and M-D designed districts were adopted. The amendments became effective March 5, 1957. Section 8 (B) (11) (f) (iv) of the amended regulations provides that no use shall be permitted that will cause or result in "unusual traffic hazard or congestion due to the type of vehicles required in the use or due to the manner in which traffic enters or leaves the site of the use." On April 29, 1957, the board changed the zone of the subject property to C-D commercial and authorized its use for the purpose sought. One of the conditions of the change was that ingress to and egress from the property be limited exclusively to Buxton Farm Road.

Upon appeal, the court concluded that the board had not acted arbitrarily, illegally or in abuse of its discretion. The plaintiffs have assigned several reasons why the judgment should be reversed. In the light in which we view the matter, we will discuss but two of them.

The limited finding filed by the court, which was proper upon such an appeal as this, does not disclose the basis of its decision. Therefore we consult the memorandum of decision to ascertain the legal conclusions upon which the judgment rests. *Treat* v.

*Town Plan & Zoning Commission,* 145 Conn. 136, 140, 139 A.2d 601; Maltbie, Conn. App. Proc., § 152. In the memorandum, the court states: "The area affected is residential of very fine type, and the change of zone will increase traffic in the vicinity to a considerable degree. The change of zone will depreciate property values of premises in close proximity to the changed zone." One of the purposes of zoning in Stamford is to lessen congestion in the streets. 26 Spec. Laws 1234, § 550; Stamford Zoning Regs., § 1 (1956). An issue before the court, as indicated by its memorandum of decision, was whether the zoning board, upon the facts before it, abused its discretion in determining that the traffic conditions resulting from the proposed change of zone would not create a congestion of traffic in the highways affected which would violate the purpose stated in the special law. See *Pecora* v. *Zoning Commission,* 145 Conn. 435, 440, 144 A.2d 48. That the board did not abuse its discretion in this respect is implicit in the court's conclusion sustaining the board's action. Our task is to determine the correctness of that conclusion.

The thirty-nine-acre tract is interior property without any direct access to a public highway. The sole entrance to the tract is through Buxton Farm Road, a private road running easterly from River Road. The properties on both sides of Buxton Farm Road from River Road to the Catty property are in an RA-1 district. One of these is the home of the plaintiff Gordon. All traffic into and out of the Catty property passes by it. Gates at the entrance to Buxton Farm Road can be closed to exclude the public. River Road in this area runs substantially north and south. About 500 feet west of it, High Ridge Road runs parallel to it and carries much of the

Merritt Parkway traffic into and out of Stamford. The west-bound ramps of the parkway enter from High Ridge Road. About 500 feet south of the parkway there is a feeder road from High Ridge Road to River Road which carries east-bound parkway traffic to the ramps onto the parkway. This feeder road is about opposite Buxton Farm Road.

The plans of A.M.F. for the development of the subject property provide for buildings accommodating a work force of 1010 initially. A traffic survey prepared for A.M.F. by traffic consultants shows that 719 of these employees would go to and from work by automobile and 291 would use public service busses. With the use of car pools, the 719 automobile riders would travel in 400 cars. The employees' working hours would be from 9 a.m. to 5 p.m. A minimum of 400 cars, and quite likely many more than that, would have to pass in and out of Buxton Farm Road before the laboratories opened, and after they closed, each day. The A.M.F. survey as well as two others conducted for the plaintiffs shows that the peak hours of traffic on the Merritt Parkway itself and on the High Ridge Road interchange are between 8 and 9 o'clock in the morning and between 5 and 6 o'clock in the afternoon. These are the hours within which the A.M.F. employees would be arriving or leaving. The afternoon traffic between 5 and 6 o'clock is about 25 per cent greater than that in the morning rush hour. At the time of the surveys, east-bound traffic from High Ridge Road onto the parkway often backed up on the entrance ramp while waiting to get into the east-bound lane. This in turn blocked traffic into and out of River Road and caused east-bound cars on the parkway to come to a standstill while waiting for the exit to clear. River Road is a winding, thirty-foot road, without curbs or sidewalks,

upon which the posted speed limit is fifteen miles per hour. It is a school bus route which is not equipped for any kind of heavy traffic. The A.M.F. traffic consultant recommended that none of the A.M.F. traffic be permitted to use it. Its elimination would require all of the A.M.F. traffic to pass through the bottle neck at Buxton Farm Road, River Road and the feeder road. The capacity of the roadways in the interchange is 600 vehicles an hour. Traffic counts have shown peak-hour volumes two and one-half times that capacity. Under the existing traffic load, the facilities are now taxed to capacity, and with the injection of 400 or more additional cars into the traffic stream at the peak hours, only intolerable congestion with bumper-to-bumper traffic moving at a snail's pace could result. *Pecora v. Zoning Commission*, 145 Conn. 435, 440, 144 A.2d 48.

The plan recommended by the A.M.F. consultant to alleviate, but not remedy, the congestion would require the widening of Buxton Farm Road to thirty feet to accommodate three lanes of traffic; the addition of another east-bound lane on River Road from Buxton Farm Road to the parkway entrance and an acceleration lane at the parkway to permit gradual entrance into the flow of traffic without stopping as at present; traffic lights on High Ridge Road and River Road at either end of the connecting feeder; a major overhaul of the traffic setup at High Ridge Road and Bedford Street, more than two miles south of the parkway; and the widening of the pavement on High Ridge Road under the parkway. Also, six additional busses would be needed in the rush hours on River Road. As the zoning board has no jurisdiction over the physical improvement of the city's streets or the state's parkways or traffic control

(25 Spec. Laws 425 § 412, 429 § 430), it must be governed by actualities and not theories in assessing the impact of an exceedingly large additional volume of traffic on present strained facilities. The only answer is congestion.

The Stamford zoning regulations also provide that "[i]ngress and egress from a public highway to a business or industrial district shall be permitted through R-7½, R-5, or R-MF Residential Districts provided" that three conditions not pertinent to this case are met. § 4 (C) (3). The regulations are permissive in character. The uses which are permitted in each type of zone are spelled out. Any use that is not permitted is automatically excluded. The R-7½, R-5 and R-MF zones are three of the lowest residential classifications. § 4. As the regulations do not permit access to a commercial district through an RA-1 zone, the board lacked the authority to attach the condition of ingress to and egress from the subject property through Buxton Farm Road.

Courts cannot substitute their discretion for the liberal discretion which the legislature has conferred on local zoning authorities. *Suffield Heights Corporation* v. *Town Planning Commission,* 144 Conn. 425, 427, 133 A.2d 612. They can, however, grant relief upon appeal where the local authority has acted arbitrarily or illegally and consequently has abused the discretion vested in it. Id., 428. In disregarding the special law and the zoning regulations relating to traffic congestion and access to commercial property through a residential area, the board acted illegally.

There is error in both cases, the judgments are set aside and the cases are remanded with direction to sustain both appeals.

In this opinion the other judges concurred.