[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the approval of a planned development district application filed by the defendants Shelton Center Associates and R.D. Scinto, Inc. The subject property consists of about ten acres of land at 875 Bridgeport Avenue also known as Route 714 (and formerly Old Route 8) in Shelton. It is located in an industrial zone designated IA-2. There is an existing one story concrete block building on the property, which is used for a permitted industrial use, a parking lot and a concrete lined pond fronting on Bridgeport Avenue. Shelton Center Associates (Shelton Center) as property owner and Scinto as developer is attempting to obtain approvals required under section 34 of the Shelton Zoning Regulations, and intend to demolish the existing building and redesign the site for an 86,000 square foot shopping center with an additional 10,000 square feet of office space above the main building. (By stipulation of the parties ABS Development Company, a general partnership, was allowed to intervene as an additional defendant since it acquired title from Shelton Center a few days before the trial. All parties stipulated that ABS Development Company has adopted the answer and brief of Shelton Center and it is represented by the same attorney. The defendants also stipulated that the special defense in the answer was withdrawn.) The proposal calls for enlarging the existing parking areas somewhat to provide 454 parking spaces. The property has about 700 feet of frontage on Bridgeport Avenue, and two entrances are proposed, one on each end of the property.
The plaintiff, Shelton Square Limited Partnership (Shelton Square) is a Connecticut limited partnership which owns land and buildings known as the Shelton Square Shopping Square containing about 21 acres located on the opposite side of Bridgeport Avenue from the subject property of Shelton Center.
Most of the properties in the area are in an industrial zone or have been developed as commercial property. The plaintiff's property was approved for a Planned Development District around 1980 and it is the largest shopping center in Shelton. It consists of a large one story building in the rear of the property and 913 parking spaces in the front, but set back from Bridgeport Avenue, and other improvements. The total retail space in the shopping center is 182,715 square feet, and the tenants consist of a Stop Shop supermarket, a Bradlees department store, a Burger King restaurant, a bank, CT Page 3421 a healthcare facility and about 16 additional retail shops.
The application filed by Scinto and Shelton Center in May 1980 with the defendant Commission requested approval for a Special Development Area (SDA) and a Planned Development District (PDD) for the subject property. A public hearing was held on both applications on August 7, 1990.
The subject of the impact of traffic from the proposed shopping center upon highways in the area was discussed at the public hearing. Comments were similar to those summarized in Whalen v. Town Plan and Zoning Commission,146 Conn. 321, 325, 326 as follows:
 "Most of the oral testimony before the Commission consisted of glowing statements by the proponents' attorneys on the advantages to the community of the project, while the attorneys for the opponents painted a gloomy picture of the effect upon the neighborhood if the gargantuan plans received approbation. Each side produced experts, or reports by experts, in the fields of traffic control and town planning. Their opinions favored the view of their employers."
A traffic engineer, Patricia Kirkwood of Kasper Associates, Inc. submitted a traffic impact study (Kasper report) and summarized it at the public hearing. The traffic study considered the amount of additional traffic that would be generated from the proposed use on the subject property. There would be minimal changes in traffic during the morning peak hour. During the evening peak hour there was a projected additional 265 vehicles entering the site using a conservative, worst case analysis on a Friday evening when the shopping center across the street on the plaintiff's property would be extensively used. The report projected that the additional traffic volume would be split between the two driveways leaving the property. The report recommended some changes and improvements to the adjacent roadways such as turning lanes, and concluded that with changes to traffic signals, the traffic level on Bridgeport Avenue adjacent to the subject property and the defendants property would improve from a service level C to a service level B in the morning peak hour, and change from a service level C to a service level D during the evening peak hour. The report found no change in the level of service at the intersection of Bridgeport Avenue and Trap Falls Road. It concluded that at all key intersections traffic would be at an acceptable level of service during the peak hours, and the proposed project could be safety accommodated by the adjacent roadway CT Page 3422 system.
Representatives of the plaintiff also attended the public hearing, including Kevin Mentz a traffic engineer with the firm of Wilbur Smith Associates. His report concluded that there would be 1,000 total trips per hour during the weekday peak hour and 850 trips per hour on Saturdays at the midday peak hour, and that the levels of service would deteriorate to unacceptable levels. The plaintiff's attorney opposed the application on various technical and legal grounds. A general partner of the plaintiff, Warren Schwerin, claimed basically that while he was not opposed to competition, that the immediate area would not support two shopping centers.
The Commission approved the SDA designation on September 18, 1990, but did not act on the PDD application at that time. After a legal notice of the SDA approval was published, the plaintiff appealed that decision. (Shelton Square Limited Partnership v. Shelton Planning and Zoning Commission, et al., Superior Court at Milford, No. CV90 0033652S, a companion case to this appeal). On December 10, 1990 the defendant Commission approved the PDD application. A legal notice was published December 14, 1990, and the plaintiff commenced this appeal. The claims raised in both appeals are similar, and consist of both procedural and substantive challenges to the proceedings and the Commission's decisions, including a claim that the PDD approval process in section 34 of the Shelton Zoning. Regulations violates Chapter 124 of the Connecticut General Statutes. Before reaching these claims there must be a determination whether the plaintiff has standing to bring this appeal, namely whether it has proven aggrievement under section 8-8 of the General Statutes.
Pleading and proof of aggrievement are essential to establish subject matter jurisdiction over an administrative appeal. Hughes v. Town Planning and Zoning Commission,156 Conn. 505, 507, 509; Walls v. Planning and Zoning Commission,176 Conn. 475, 479. The plaintiff has the burden of proof on aggrievement. Beckish v. Manafort, 175 Conn. 415, 419. Section 8-8 (b) C.G.S. limits the right to appeal to any person aggrieved by a decision of the administrative agency, which includes a combined planning and zoning commission. An "aggrieved person" includes any person owning land that abuts or is within a radius of 100 feet of any portion of the land involved in the decision of the agency. Section 8-8 (a)(1) C.G.S. This provision, giving standing to an appeal based solely on the status as an abutting land owner or a person owning property within the designated distance of the land CT Page 3423 involved in the agency's decision, is called "statutory aggrievement". Pierce v. Zoning Board of Appeals, 7 Conn. App. 632,636; Nick v. Planning and Zoning Commission,6 Conn. App. 110, 111n. The plaintiff claims standing based on both statutory aggrievement and "classical aggrievement". The subject property and the plaintiff's property are on opposite sides of Bridgeport Avenue. When computing the statutory distance where a road intervenes between two properties, consideration must be given to whether the appellant owns to the center line of the road. Fuller v. Planning and Zoning Commission, 21 Conn. App. 340, 345. In the absence of evidence to the contrary, there is a presumption that owners of land abutting a public highway own to the center line of the road, subject to the easement for public travel. Antenucci v. Hartford Roman Catholic Diocesan Corporation, 142 Conn. 349, 355. There was evidence in this case that the state owns the 155 wide right of way to Bridgeport Avenue. When the state acquires property for a public highway, it obtains a fee simple interest. Section13a-73 (b) C.G.S. The plaintiff does not own land within 100 feet of any portion of the land involved in the two related applications to the Commission. The travelled way of Bridgeport Avenue is about 40 feet wide and is within the state's right of way, and the plaintiff has an easement from its property line across the state-owned right of way to the travelled way of the public highway. The intersection of the plaintiff's easement and the travelled way of the public highway is about 80 feet from the subject property. From this the plaintiff argues that it has proven statutory aggrievement and that the easement from the state is equivalent to ownership of land. No case has been cited which supports this proposition. Smith v. Planning and Zoning Board, 203 Conn. 317, 323, held that an exclusive life tenant of property had a sufficient interest in the land during her lifetime as to amount to an ownership interest giving the right to appeal under section 8-8. In this case the plaintiff has only an easement, and the fee title to the entire right of way is in the state. The statute is clear, and it does not disclose legislative intent to confer standing to appeal on the holder of either an exclusive or nonexclusive easement.
Since the plaintiff does not own property within 100 feet of the land involved in the applications, it must prove classical aggrievement. Persons owning land near land involved in the application to the commission are not automatically aggrieved, and have to meet the two part aggrievement test. Walls v. Planning and Zoning Commission, supra, 476; Hughes v. Town Planning and Zoning Commission, supra, 508; Vose v. Planning and Zoning Commission, 171 Conn. 480, CT Page 3424 484. This test requires: (1) demonstrating a specific, personal and legal interest in the subject matter of the decision as distinguished from a general interest, such as is the concern of all members of the community as a whole; and (2) that this specific personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning and Zoning Commission, supra, 478; Sheridan v. Planning Board, 159 Conn. 1, 10. Aggrievement is a question of fact, and the plaintiff has the burden of proving that fact. Olsen v. Inland Wetlands Commission, 6 Conn. App. 715,718; Hartford Distributors, Inc. v. Liquor Control Commission, 177 Conn. 616, 622. Aggrievement must take into account the subject matter of the decision made by the administrative agency. To resolve the aggrievement question here, it must first be determined what the Commission's decision was and what rights it created, which in turn requires consideration of the Planned Development District process under section 34 of the Shelton Zoning Regulations.
In Mileski v. Planning and Zoning Commission of Shelton, 2 CtLR 68, 16 Conn. Law Trib. 36 (1990) the Planned Development District regulations and procedures were considered. Section 34 has a three stage procedure to establish a Planned Development District. The first step is designation of the subject property as an SDA. The second step is an informal PDD application with a Basic Development Plan. Sections 34.4, 34.5 and 34.6. The third and final step is a formal or final application for a PDD with Detailed Development Plans. Section 34.7 and 34.8. The applications filed for the subject property were for the first and second steps of PDD approval under section 34. No application has been filed or granted for the third and final step, a final application for a PDD with Detailed Development Plans.
An SDA is defined in section 21.2 and amounts to a special district which can be placed upon property in addition to or overlapping the existing zoning classification or district of the subject property. An SDA does not change the zone of the underlying property or grant any right to develop the property for any uses that are not already permitted in the underlying zone. "A Planned Development District is a class of district established in accordance with section 34 and located within a Special Development Area." Section 21.3, Shelton Zoning Regulations. While a PDD cannot be created for a parcel of land unless the parcel is first designated as an SDA, the PDD also does not come into existence until it is established in accordance with the requirements in section 34. Sections 21.3 and 34.1. As discussed in the SDA appeal (#33652) the plaintiff was not CT Page 3425 aggrieved by the approval of an SDA for the subject property.
The claim of aggrievement in this case is based upon the erroneous assumption that the initial or informal PDD approval, the second step under section 34, amounted to a zone change. The second application was a petition for a PDD under section 34.5 of the zoning regulations, which required a Basic Development Plan under section 34.5.2. The Commission held a public hearing on this application as required by section 34.6. That regulation provides in part:
 "After the public hearing, the Commission may disapprove or give approval to the Basic Development Plans or approval subject to modifications, only after the Commission makes the findings set forth under Paragraph 34.8 below, in addition to other findings necessary for amendment of these Regulations. Approval of the Basic Development Plans shall not constitute final approval of the Planned Development District and shall simply authorize the submission of Detailed Development Plans setting forth in detail the specifics of the proposed development and showing and modifications specified by the Commission. If the Detailed Development Plans are approved by the Commission, the Planned Development District shall be considered established and these Zoning Regulations and Zoning Map shall be considered to be modified to permit the establishment of the development as approved."
The Commission's resolution found that the property was suitable for a PDD, but indicated that certain information should be required with the submission of Detail Development Plans. The resolution concluded with the statement "[t]hat there is no zone change adopted at this time. At such time as the final, Detailed Development Plans are submitted and approved by the Commission, the Planned Development District shall then be adopted to permit the establishment of the development as approved." The Commission's approval of the PDD application determined that the subject property was suitable for special development as a PDD but it was not the adoption of a PDD or an amendment to the zoning regulations and zoning map. The property can not be used for the proposed shopping center until Detailed Development Plans are submitted to the Commission in compliance with section 34.7, requiring a site plan and other documents. Since the PDD was not established and the zoning regulations and zoning map were not amended as a result of the Commission's approval of December 10, 1990, the plaintiff's aggrievement claim CT Page 3426 must be considered in that context.
As discussed in Mileski v. Planning and Zoning Commission of Shelton, supra, the Planned Development District procedure in section 34 of the Shelton Zoning Regulations has some similarity to Planned Unit Developments under former chapter 124a of the General Statutes, which was repealed in 1985. Section 8-2d C.G.S. While former section 8-13k of the General Statutes allowed an appeal from the granting or denial of tentative or final approval of a Planned Unit Development, there are no reported decisions of any appeals. Cases concerning floating zones have held that no one is aggrieved by the enactment of floating zone regulations, so an appeal cannot be maintained under section8-8 until a floating zone is applied to a specific piece of property and a zone change occurs. Schwartz v. Town Plan and Zoning Commission, 168 Conn. 20, 23-26; Sheridan v. Planning Board, supra, 12, 13. While the second step of PDD approval under the Shelton Zoning Regulations is different from floating zones since it grants tentative approval directed to a particular piece of property, it is not effective as a zone change and does not permit the new use of the property until Detailed Development Plans are submitted and approved as part of the third stage of the application process under chapter 34. Assuming that the plaintiff's interest in the Commission's decision is different from the community as a whole as required by the first part of the classical aggrievement test, it is difficult to see how the plaintiff has been specially and injuriously affected by the Commission's decision since the zone of the subject property has not been changed and construction of the proposed shopping center has not been approved. In fact, unless final approval is given, the proposed development will never occur.
In its appeal Shelton Square claims that approval of the PDD will reduce the value of its property and increase traffic congestion and safety hazards on its property. There was no credible evidence at the trial that development of the subject property for the proposed shopping center would reduce the value of the plaintiff's property. An appellant who claims an adverse affect on its competitive business position because of a zoning decision allowing a particular land use for a competitor is not aggrieved in the absence of showing of injury to its property rights. State Medical Society v. Board of Examiners in Podiatry 203 Conn. 295,301; Whitney Theater Co. v. Zoning Board of Appeals,150 Conn. 285, 288; London v. Planning and Zoning Commission,149 Conn. 282, 284; Mott's Realty Corporation v. Town Plan and Zoning Commission, 152 Conn. 535, 537. The probability of increased traffic hazards and traffic congestion if a CT Page 3427 competitor starts a business in the area can establish aggrievement. Gregorio v. Zoning Board of Appeals, 155 Conn. 422,426. Any injury would be to the plaintiff's tenants and not to the plaintiff itself, and the tenants are not appellants in this case; their loss of business at most indirectly affects the plaintiff as owner of the shopping center.
Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected. Hall v. Planning Commission, 181 Conn. 442, 445; Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 530. However, mere generalizations and fears of the effects of the agency's decision do not establish aggrievement. Walls v. Planning and Zoning Commission, 176 Conn. 475, 478; Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 497; Sheridan v. Planning Board, supra, 14; Hughes v. Town Planning and Zoning Commission, supra, 508.
There was evidence in the applicant's traffic report and at the trial that construction of an additional shopping center on the subject property would benefit the plaintiff's shopping center, because it would attract additional business to the area, and neither center would have exclusive customers. Related to this, the proposed center on the subject property would draw to some extent from existing traffic on Bridgeport Avenue, including some vehicles using the plaintiff's center. The Kasper report concluded that of the 20 percent of the traffic that would use the subject property, 15 percent would be traffic already passing the site on the existing road network. The Commission's resolution found this percentage to be conservative. One traffic count in the Kasper report, compiled by another traffic engineer, found the traffic volume during the peak afternoon hour after development to be 2,713 vehicles in the vicinity of Bridgeport Avenue, Trap Falls Road and Armstrong Road. The Kasper report concluded a 90,000 square foot shopping center would have approximately 265 additional vehicles entering the site during the evening peak hour. The report made specific recommendations for roadway improvements adjacent to the shopping center, including a right turn lane, a change in the signal timing and a widening of the northbound lane of Bridgeport Avenue to provide an exclusive left turn lane into the site. With these improvements traffic was expected during the peak hour to be at level of service D or better. [Traffic engineers consider this level as acceptable for traffic flow. At level D there may be delays between 25 and 40 seconds per vehicle but lower demands will occur often enough to permit clearance of CT Page 3428 developing line, thus preventing excessive backup. At times other than the evening peak hour the level of service would be higher (A, B or C). Level of service E involves delay to all motorists due to congestion and is considered to be the limit of acceptable delay].
The opponents traffic report found lower levels of service than level D during the evening peak hour, but as recognized by the Commission, it failed to take into account either required physical improvements to the roadway or signalization changes. Bridgeport Avenue is a state highway, Route 714, and a shopping center having an exit or entrance onto any state highway or substantially affecting state highway traffic requires a certificate of approval from the State Traffic Commission (STC) under section 14-311 of the General Statutes. The STC can refuse to issue a permit if it concludes that the proposed development will imperil public safety. Section 14-311 (a) C.G.S. If the STC determines that traffic signals, pavement markings, channelization, pavement widening or other changes in traffic control devices are required, it can make them a condition of a certificate of approval, and can impose the entire cost of such improvements on the property owner. Section 14-311 (d) C.G.S.
Traffic is a material consideration in reviewing zone changes and other actions of a zoning commission, but consideration under section 8-2 of the General Statutes is not the overall volume of traffic, but whether the increase in traffic will cause congestion. Lathrop v. Planning and Zoning Commission, 164 Conn. 215, 222; Stiles v. Town Council, 159 Conn. 212, 219. The improvements that the STC will require here have not been determined, but the Kasper report shows that highway improvements can be made sufficient to prevent traffic congestion. Moreover, the STC will presumably require suitable improvements pursuant to section14-311 (d) which will be equivalent to or more extensive than those recommended in the Kasper report. The opinion of the plaintiff's traffic experts in their traffic report, before the Commission and at the trial failed to adequately take into account highway and signalization improvements that will be required if traffic congestion would result without them. Accordingly, the Court does not accept their opinion that there may be traffic congestion or that the level of service on Bridgeport Avenue will be below level of service D. Even if the Commission's decision had been a final approval of the project and a zone change, the evidence does not show a reasonable possibility of increased traffic hazards and traffic congestion if the shopping center is constructed as proposed on the subject property. The plaintiff's concerns amount to mere generalizations and unrealistic fears CT Page 3429 of problems to its tenants, which is insufficient to prove aggrievement. Walls v. Planning and Zoning Commission, supra, 478.
There was also a claim of possible drainage problems on the plaintiff's property if the project is constructed. The evidence presented was insufficient to show the possibility of any drainage problems or flooding of the plaintiff's land from the proposed construction sufficient to prove aggrievement, as in such cases as Hall v. Planning Commission, 181 Conn. 442, 445. There is presently a paved parking lot on the subject property, the existing drainage facilities which the plaintiff is required to maintain on its own property appear adequate to handle existing or additional drainage, and any periodic drainage problems experienced by the plaintiff are from its own failure to properly maintain the culverts on its own property.
Even if increased traffic on Bridgeport Avenue would result in a reasonable possibility of injury to the property and other legal rights of the plaintiff, in order to prove aggrievement a plaintiff must be adversely affected by the subject matter of the decision of the Commission. The decision here on the PDD was only a preliminary approval under the second step of the procedures in chapter 34 of the zoning regulations, and did not amount to a zone change or final zoning approval for the project. The action taken did not specially and injuriously affect the property or other legal rights of the plaintiff. Under the circumstances here there is no aggrievement and any claim of injury is premature. See Schwartz v. Town Plan and Zoning Commission, supra, 25.
The appeal is dismissed.
Robert A. Fuller, Judge